Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000392
28-JUN-2013
08:02 AM

NO. CAAP-11-0000392

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
ALLEN TAVARES, Defendant-Appellant
and FRANK HAMPP, Defendant.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 09-1-1864)


MEMORANDUM OPINION
(By: Nakamura, C.J., Foley and Ginoza, JJ.)

Defendant-Appellant Allen Tavares (Tavares) appeals
from the Judgment of Conviction and Sentence (Judgment) entered
by the Circuit Court of the First Circuit (circuit court)[1] on
April 6, 2011, convicting him of Ownership or Possession
Prohibited of Any Firearm Or Ammunition By a Person Convicted of
Certain Crimes, pursuant to Hawaii Revised Statutes (HRS) § 134-
7(b) and (h) (2011 Repl.).

Prior to trial, Tavares filed a Motion to Suppress
Evidence (motion to suppress), seeking to preclude Plaintiff-
Appellee State of Hawai'i (State) from introducing at trial a
gun, a magazine clip, cartridges, and a holster that were seized
by Honolulu Police Department (HPD) officers on November 30,

---

[1] The Honorable Dexter D. Del Rosario presided.

2010, and to preclude testimony as to events that occurred after Tavares' vehicle was stopped and evidence seized that Tavares contends are "fruits of the poisonous tree." On July 9, 2010, the circuit court denied Tavares' motion to suppress. On July 28, 2010, the circuit court filed its "Findings of Fact, Conclusions of Law and Order Denying [Tavares'] Motion to Suppress Evidence."

On October 14, 2010, at the close of the State's case at trial, Tavares made an oral motion for judgment of acquittal, arguing that based on the evidence in the light most favorable to the State, the State had failed to show that Tavares had possession or control of the firearm. Tavares also argued that the rear seat passenger, Frank Hampp (Hampp),[2] and the front seat passenger, Orrin Simer (Simer), had the opportunity to place the weapon under the driver's seat. The court denied the motion. Tavares also renewed his motion to suppress, which was denied.

On October 15, 2010, Tavares renewed his motion for judgment of acquittal, which the circuit court denied. On the same day, the parties made their closing arguments to the jury. The deputy prosecuting attorney (DPA) argued, in relevant part, that there was "mechanical stuff under the seat" that would have prevented Hampp from sliding the gun underneath the driver's seat.

On October 18, 2010, the jury returned its verdict finding Tavares guilty of Ownership or Possession Prohibited of Any Firearm Or Ammunition By a Person Convicted of Certain Crimes, pursuant to Hawaii Revised Statutes (HRS) § 134-7(b) and (h).

---

[2] Evidence in the record reflects that Hampp was an escapee from Laumaka prison at the time. Tavares claims he did not know Hampp and was giving him a ride because Hampp happened to be with Simer when Tavares picked-up Simer to give him a ride.

On appeal, Tavares contends: (1) the circuit court erred in denying his motion to suppress because the police lacked reasonable suspicion to stop his vehicle; (2) the circuit court erred in denying his motions for judgment of acquittal because there was insufficient evidence that Tavares knowingly possessed the firearm and ammunition; and (3) the DPA committed prosecutorial misconduct during the State's closing argument by arguing facts not in evidence.

For the reasons discussed below, we vacate the Judgment and remand this case to the circuit court for further proceedings.

## I. **Motion To Suppress**

Tavares argues that the circuit court erred in denying his motion to suppress because he was subjected to an illegal search and seizure when the police stopped his vehicle. In particular, Tavares contends that police officers did not have reasonable suspicion to stop his vehicle.

We review *de novo* the circuit court's ruling on the motion to suppress. State v. Edwards, 96 Hawai'i 224, 231, 30 P.3d 238, 245 (2001).

> The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution.

State v. Kaleohano, 99 Hawai'i 370, 375, 56 P.3d 138, 143 (2002). In addressing this issue, we consider both the record of the hearing on the motion to suppress and the trial record. State v. Kong, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App. 1994).

In determining the reasonableness of discretionary automobile stops, we apply the standard set forth in Terry v. Ohio, 392 U.S. 1 (1968). See State v. Bohannon, 102 Hawai'i 228,

3

237, 74 P.3d 980, 989 (2003). To justify an investigative stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. (quoting State v. Barnes, 58 Haw. 333, 338, 568 P.2d 1207, 1211 (1977)) (internal quotation marks omitted). In determining whether the officer had specific and articulable facts to justify an investigative stop, we consider the totality of the circumstances measured by an objective standard. State v. Eleneki, 106 Hawai'i 177, 192-93, 102 P.3d 1075, 1090-91 (2004).

The crux of Tavares' argument is that the traffic stop was pretextual because the observations of officer Michael Lucas-Medeiros (Officer Lucas-Medeiros) and officer Jeffrey Fleigner (Officer Fleigner) were not credible.

The circuit court was right in denying Tavares' motions to suppress because Tavares did not meet his burden of establishing by a preponderance of the evidence that the police stopped his vehicle without reasonable suspicion. See State v. Wilson, 92 Hawai'i 45, 48, 987 P.2d 268, 271 (1999). Based on the evidence in the record, the officers had reasonable suspicion to stop Tavares given the decal they observed covering a large portion of the passenger side of the windshield of Tavares' vehicle. Revised Ordinances of Honolulu (ROH) § 15-19.30(a) (1978) states that "[n]o person shall drive any motor vehicle with any sign, poster or nontransparent material upon the front windshield, side wings, or side or rear windows of such vehicle which obstructs the driver's clear view of the highway or any intersecting highway." At the hearing on the motion to suppress, Officer Lucas-Medeiros testified that as Tavares' vehicle got closer to where Officer Lucas-Medeiros' vehicle was parked, Officer Lucas-Medeiros could observe a decal on Tavares' front windshield. Officer Lucas-Medeiros testified that the decal was

4

"probably ten inches wide the whole width of the windshield[.]" Officer Lucas-Medeiros testified that the decal was on the middle of the passenger side of the windshield, and it was "dark-colored" or "black." Also at the hearing on the motion to suppress, Officer Fleigner testified that he noticed a decal on the windshield as the car passed by. He believed that this decal was blocking the driver's view. Pictures depicting the decal on the passenger side of the windshield were entered into evidence and show the decal covering a large portion of the windshield on the passenger side.

At trial, Officer Lucas-Medeiros testified that "[a]s the vehicle drove closer, I could observe a large decal on the passenger side of the windshield." He testified that the sticker looked like it was covering the whole passenger side of the windshield and that it was a big sticker. Officer Lucas-Medeiros testified that he stopped Tavares' vehicle because of "[t]he decal which was blocking the passenger side and the cracked windshield[.]" Officer Lucas-Medeiros further testified that the decal was about eight inches wide and probably "18, 20 inches long[,]" and it was blocking approximately 80 percent of the passenger side from the top to the bottom of the front windshield.

Tavares cites to People v. White, 132 Cal. Rptr.2d 371, (Cal. Ct. App. 2003), where the court construed a windshield provision similar to ROH § 15-19.30. 132 Cal. Rptr.2d at 374. Based on the evidence presented in that case, the court concluded that it was not reasonable for the subject police officer to believe that an air freshener hanging from the rearview mirror may have obstructed or reduced the driver's clear view, and thus the vehicle stop could not be justified on that basis. Id. at 375. In White, there was evidence that the air freshener covered

5

less than .05 percent of the total surface of the car's windshield.  Id. at 375.

Tavares also cites to People v. Arias, 159 P.3d 134 (Colo. 2007), where the Colorado Supreme Court construed a statute similar to ROH § 15-19.30.  Arias, 159 P.3d at 138. There, an officer testified that he believed that it was legal to stop a vehicle solely on the basis that an air freshener was hanging from the rearview mirror; he did not verify the size of the air freshener, its angle of position, or whether it actually obstructed the driver's vision; and he only testified that the air freshener "could have" obstructed the driver's vision.  The defendant testified that there were actually three small air fresheners instead of one large one and that they "in no way obstructed his vision."  Id. at 138-39.  The court in Arias concluded "that the trial court correctly determined that Officer Gray did not have reasonable and articulable suspicion to believe that a crime had been committed at the time he initiated the traffic stop."  Id. at 139.

This case is distinguishable from White and Arias inasmuch as the testimony of Officer Lucas-Medeiros and Officer Fleigner establish that they observed a large decal on the passenger side of the vehicle's windshield, the decal covered a large portion of the windshield, and they believed it was blocking the driver's view.  Moreover, photographs of the decal clearly show the size and placement of the decal.  In sum, the evidence in this case provides an objective basis for the stop of the vehicle, because it was reasonable for the officers to believe that the decal "obstruct[ed] the driver's clear view of the highway or any intersecting highway."  See ROH § 15-19.30.

Because we conclude that Officer Lucas-Medeiros and Officer Fleigner had reasonable suspicion to stop Tavares' vehicle based on the large decal on the passenger side of the

vehicle's windshield, we need not and thus do not reach Tavares' remaining arguments with respect to this point of error.

## II. **Sufficiency of the Evidence**

Tavares argues that there was insufficient evidence to convict him of knowing possession of the firearm and ammunition pursuant to HRS § 134-7(b),[3] and thus the circuit court erred in denying his motions for judgment of acquittal raised at the close of the State's case and at the close of all the evidence.

> When reviewing a motion for judgment of acquittal,
>
> we employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

State v. Smith, 97 Hawai'i 166, 169, 34 P.3d 1065, 1068 (App. 2001) (citations omitted) (quoting State v. Timoteo, 87 Hawai'i 108, 112-13, 952 P.2d 865, 869-70 (1997)).

Tavares contends there was insufficient evidence to support a finding of constructive possession of the firearm and ammunition.

> The law, in general, recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the

---

[3] HRS § 134-7(b) states:

> No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

7

<u>power and the intention at a given time to exercise dominion
over a thing, either directly or through another person or
persons, is then in constructive possession of it</u>.

State v. Foster, 128 Hawai'i 18, 26, 282 P.3d 560, 568 (2012)
(emphasis added) (quoting State v. Jenkins, 93 Hawai'i 87, 110,
997 P.2d 13, 36 (2000)).  As recently reiterated by the Hawai'i
Supreme Court:

> "To support a finding of constructive possession <u>the
> evidence must show a sufficient nexus between the accused
> and the [item] to permit an inference that the accused had
> both the power and the intent to exercise dominion and
> control over the [item]. Mere proximity is not enough</u>."
> [State v.] Moniz, 92 Hawai'i [472,] 476, 992 P.2d [741,] 745
> [2012]. Moniz further established that
>
>> [p]roof of the defendant's knowledge of the presence
>> of [the items] and the defendant's ownership or right
>> to possession of the place where the [items] were
>> found, alone, are insufficient to support a finding of
>> the exercise of dominion and control. Other
>> incriminating circumstances must be present to
>> buttress the inference of knowing possession and
>> provide the necessary link between a defendant and
>> illegal [items].
>
> 92 Hawai'i at 476-77, 992 P.2d at 745-46.

Foster, 128 Hawai'i at 26, 282 P.3d at 568 (emphasis added, some
internal citations omitted).  "[M]ere proximity to the [item],
mere presence, or mere association with the person who does
control the [item] is insufficient to support a finding of
possession."  Id. at 27, 282 P.3d at 569 (quoting State v.
Hironaka, 99 Hawai'i 198, 206, 53 P.3d 806, 814 (2002)) (internal
quotation mark omitted).

Here, viewing the evidence in the light most favorable
to the State and fully recognizing the province of the trier of
fact, there was sufficient evidence to support a prima facie case
that Tavares had the power and intent to exercise dominion and
control over the firearm and the ammunition.

There is no dispute that Tavares was driving when the
vehicle was stopped.  After Tavares exited the vehicle and as

Simer was exiting the vehicle through the driver's side,[4] Officer Lucas-Medeiros saw the handgun sticking out from under the driver's seat, where Tavares had been sitting. In particular, Officer Lucas-Medeiros testified that, while standing at the edge of the open driver's door, he saw "the silver part of the handle with the grooves" and "the black hand grip and the magazine inserted into the magazine well." A photograph entered into evidence, depicting the handgun before it was removed from the vehicle, shows the firearm and magazine on the vehicle's floor, protruding out from under the front middle part of the driver's seat, and quite visible. This is similar to State v. Brown, 97 Hawai'i 323, 37 P.3d 572 (App. 2001), where the defendant was convicted of possession of burglar's tools. In Brown, this court first held that there was substantial evidence that the defendant, Brown, had been driving the subject van. Moreover, this court held that "there was ample evidence from which the jury could infer that Brown had the power and intent to exercise dominion and control over the tools[,]" because a backpack "was on the floorboard near the front passenger's seat, open and within Brown's reach, with a pair of bolt cutters visibly sticking out of the backpack." Id. at 337, 37 P.3d at 586.

In this case, like in Brown, there was evidence of more than just proximity to the item to support a finding of constructive possession.[5] That is, "[o]ther incriminating

---

[4] Simer was instructed to exit via the driver's door because, in order to maintain control over Hampp, who was in the backseat, the officers did not want to open the passenger door.

[5] Although proximity alone is not sufficient, proximity is relevant to the question of whether Tavares had the power and intent to exercise dominion and control over the firearm and ammunition. See Rivas v. United States, 783 A.2d 125, 131 (D.C. 2001) (en banc) ("Lest our holding be misconstrued, we do not mean to suggest that close proximity to exposed contraband-whether in a car or in a room-has no bearing on the issue of control. It plainly does."); State v. Watson, 290 S.W.3d 103, 106 (Mo. Ct. App. 2009) ("Additional circumstances which will support an inference of knowledge and control include
(continued...)

circumstances" were present to provide the link between the defendant and the illegal items. Foster, 128 Hawai'i at 26, 282 P.3d at 568 (citation omitted). Here, Tavares was the driver of the vehicle, the firearm and magazine were in close proximity to where he had been sitting and easily within his reach, and they were plainly visible on the vehicle floor sticking out from under the driver's seat.

Evidence that an item is in plain view, in addition to being in close proximity to a defendant, is a factor inferring a link between the defendant and the item. State v. Moniz, 92 Hawai'i 472, 476, 992 P.2d 741, 745 (App. 1999); See also Gray v. State, 957 N.E.2d 171, 175 (Ind. 2011) (noting that a defendant's proximity to contraband in plain view will support an inference of intent to maintain dominion or control); Lampkins v. State, 685 N.E.2d 698, 700 (Ind. 1997) (proximity to contraband in plain view is an additional circumstance supporting the inference of intent); State v. Watson, 290 S.W.3d 103, 106 (Mo. Ct. App. 2009) (additional circumstances which will support an inference of knowledge and control include the contraband being in plain view); State v. Echeverria, 934 P.2d 1214, 1217 (Wash. Ct. App. 1997) ("Given the unchallenged finding the gun was in plain sight at Mr. Echeverria's feet and the reasonable inference that he therefore knew it was there, a rational trier of fact could find Mr. Echeverria possessed or controlled the gun that was within his reach.").

Furthermore, in addition to Tavares being identified as the driver, it is undisputed that the vehicle belonged to him. Evidence that a defendant owns and/or is driving the vehicle

---

[5] (...continued)
the defendant being in close proximity to the drugs seized") (citation omitted); State v. Kemp, 688 N.W.2d 785, 789 (Iowa 2004) (in a motor vehicle case where constructive possession is at issue, a court may consider whether the contraband was found on the same side of the car seat or next to the defendant).

where the contraband is found are also relevant factors to consider when determining whether a defendant has constructive possession of an item. See Burwell v. United States, 901 A.2d 763, 767 (D.C. 2006) ("This court, like other courts, has been far more ready to sustain an inference of requisite knowledge and intent on the part of the driver than on the part of the passenger, even where, as here, the driver has not been shown to be the registered owner of the vehicle."); Taylor v. United States, 662 A.2d 1368, 1373 (D.C. 1995).

Finally, Tavares testified that he would have noticed if Hampp or Simer tried to place the gun under his seat while he was still in the car. The officers' testimony also indicated that during the short time between Tavares exiting the vehicle and the discovery of the gun, they did not observe Hampp or Simer place the gun under Tavares's seat. From this evidence, the jury could have reasonably inferred that the gun belonged to Tavares or that he had placed the gun under his seat.

Tavares argues that Simer had the closest connection to the handgun. Based on its serial number, the handgun was identified as having been stolen from the home of police officer Deric Valorosa (Officer Valorosa) in 2004, approximately five years before the incident in this case. During the same burglary, a class ring engraved with Officer Valorosa's name was also stolen. Subsequently, in 2006, Officer Valorosa's class ring was recovered at a pawn shop and the pawn ticket identified Simer as having sold the ring to the pawn shop. Thus, there is some evidence indirectly linking Simer to the handgun, but no direct evidence that Simer was the individual who burglarized

11

Officer Valorosa's home or that Simer ever possessed the handgun stolen from Officer Valorosa.[6]

The Hawaiʻi Supreme Court has noted that it is "especially reluctant to infer constructive possession of contraband by one occupant of a vehicle when there is evidence in the record explicitly linking the contraband to another occupant." Foster, 128 Hawaiʻi at 30, 282 P.3d at 572 (quoting United States v. Crain, 33 F.3d 480, 486 (5th Cir. 1994)) (citing United States v. Mergerson, 4 F.3d 337, 349 (5th Cir. 1993)) (emphasis added, internal quotation marks and brackets omitted). Unlike in Foster, the evidence in this case does not explicitly link Simer to the handgun. Moreover, Crain and Mergerson are distinguishable from the instant case.

In Foster, the defendant was driving a Toyota 4Runner with three other occupants when officers with the Department of Land and Natural Resources (DLNR) stopped the vehicle and observed an ammunition clip "between the driver and passenger on the seat[,]" and a rifle on the floor fronting the rear seat passenger on the passenger's side of the vehicle. Id. at 21, 282 P.3d at 563. The evidence showed, inter alia, that prior to being stopped by the officers, Foster had been driving his vehicle, two passengers in the vehicle had handled the rifle and ammunition, and at one point Foster had pulled over and one of

---

[6] Officer Alvin Togami (Togami) testified that he did the follow up investigation of the 2004 burglary of Officer Valorosa's home. One of the items taken in the burglary was a pistol. The serial number on this pistol matched the one discovered under Tavares' seat. Togami testified that an engraved class ring was also stolen in the burglary. In 2006, Togami went to the Waianae pawn shop in order to recover the class ring. He interviewed the pawn shop employee, who gave him the original pawn shop ticket for the ring, which contained the name and signature of Orrin Simer. The ticket also contained personal information for Simer, including his height, weight, and social security number. Togami attempted to contact Simer through his address and phone number; however there was no such address, and the phone number was not accepting any calls. Togami made no further efforts to locate Simer. Although Simer was alleged to have pawned the class ring, Togami did not know whether Simer was the individual who burglarized the house in 2004.

the passengers, Phillip Malano (Malano), shot at a junk car. Id. at 22, 282 P.3d at 564. Later, when Foster's vehicle was stopped by DLNR officers, Malano threw the rifle to the back seat and it landed on the lap of the back seat passenger on the passenger's side of the vehicle. Id. Both of the back seat passengers kicked the gun to the floor. Id.

> As noted by the Hawai'i Supreme Court in Foster,
>
> Here, despite Foster's status as driver and owner of the vehicle in which the firearm and ammunition were found, no evidence beyond that status demonstrates that Foster had any intent to exercise dominion and control over the items; in fact, the evidence in the record only links the items to Malano (and Gonsalves, who at some point loaded a number of bullets into the rifle) from the time Malano entered the 4Runner until the time that the DLNR officers stopped the 4Runner later that night. Although "dominion over a vehicle in which a firearm is found can lead to an inference of constructive possession[,]" that inference fails in the face of "overwhelming countervailing evidence" linking the firearm to another passenger.

Id. at 30, 282 P.3d at 572 (emphasis added, citation omitted). Given the evidence in Foster explicitly linking the rifle and ammunition to Malano, the supreme court held that there was insufficient evidence of intent for a jury to infer that Foster constructively possessed the firearm and ammunition. Id. at 29-30, 282 P.3d at 571-72.

In Crain, the Fifth Circuit reversed the defendant's conviction for possession of cocaine for lack of sufficient evidence. 33 F.3d at 481. There the defendant was driving a car with two other passengers when the car was pulled over for speeding. Id. at 482. At that point, the front passenger told the defendant and the back seat passenger that he had dope. Id. Both the defendant and the back seat passenger claimed that they did not know that the front seat passenger had drugs with him. Id. There was evidence that after the back seat passenger refused to hide the drugs, the front seat passenger put the drugs under the driver's seat and then sat back in his seat. Id.

13

Officers found drugs under the driver's seat.  Id. at 483.  The court noted that "while dominion over the vehicle will certainly help the government's case, it alone cannot establish constructive possession of contraband found in the vehicle, particularly in the face of evidence that strongly suggests that someone else exercised dominion and control over the contraband." Id. at 487 (quoting United States v. Wright, 24 F.3d 732, 735 (5th Cir. 1994)) (brackets omitted).

Here, unlike in Crain, there is no evidence that either Simer or Hampp had exercised dominion or control over the handgun or ammunition.  The evidence shows at most that Simer pawned Officer Valorosa's class ring, which had been stolen years earlier along with the handgun.

In Mergerson, the Fifth Circuit held that the evidence was insufficient to support a conviction for possession of a firearm by a felon.  4 F.3d at 349.  A gun was found under the mattress of a bed in the room that the defendant shared with his girlfriend/co-defendant.  Id. at 348.  At trial, a pawnshop receipt was admitted as evidence showing that the weapon had been purchased by the girlfriend well before the defendant had moved into the residence.  Id.  The court held that where a residence is jointly occupied, "something else (e.g., some circumstantial indicium of possession) is required besides mere joint occupancy before constructive possession is established."  Id. at 349.  The court went on to note that "the weapon was not in plain view and there were no other circumstantial indicia that established that Mergerson even knew of the weapon. Indeed, there was evidence to the contrary - namely, the pawnshop receipt that showed that Sheila Guy was the owner of the weapon."  Id. (footnote omitted).

In this case, viewing the evidence in the light most favorable to the prosecution, Tavares' close proximity to the handgun, the fact that he both owned and drove the car at the

time the handgun was found, the undisputed fact that the handgun was in plain view, and the lack of evidence that either Simer or Hampp exercised dominion or control over the handgun constitutes substantial circumstantial evidence that Tavares had the power and intent to exercise dominion and control over the handgun. In our view and considering the cases that have addressed similar circumstances, the evidence linking Simer to Officer Valorosa's class ring is too attenuated to be evidence "explicitly linking" the handgun to Simer at the time the handgun was discovered in Tavares' vehicle.

III. **Prosecutorial Misconduct**

Tavares argues that the DPA committed prosecutorial misconduct during closing argument when she argued that "[t]here's mechanical stuff underneath the seat" such that, given the thickness of the gun, it would have gotten caught if Hampp had tried to shove it under the driver's seat from the back. Defense counsel immediately objected that the DPA was stating facts not in evidence. The circuit court overruled the objection and the DPA went on to argue that the gun "would have gotten stuck. It wouldn't have made it all the way to the front. The only person that could have put it there is the defendant. That's why he is guilty."

When a defendant alleges prosecutorial misconduct, an appellate court must decide "(1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution." State v. Maluia, 107 Hawai'i 20, 26, 108 P.3d 974, 980 (2005). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness

15

of the evidence against defendant." Id. at 27, 108 P.3d at 981 (citation and internal quotation marks omitted). "Misconduct of a prosecutor may provide grounds for a new trial where there is a reasonable possibility that the misconduct complained of might have contributed to the conviction." State v. Klinge, 92 Hawai'i 577, 590, 994 P.2d 509, 522 (2000) (citation omitted).

"During closing argument, a prosecutor is permitted to draw reasonable inferences from the evidence[.]" Id. at 592, 994 P.2d at 524 (citation and internal quotation mark omitted). However, due to the "significant persuasive force" of the prosecutor's argument, "the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct." Id. (quoting State v. Rogen, 91 Hawai'i 405, 413, 984 P.2d 1231, 1239 (1999)).

From our review of the record, we conclude that there is no evidence to support the DPA's statements during closing argument that there was "mechanical stuff underneath the [driver's] seat" such that the handgun would have gotten caught underneath. The State argues that the DPA properly drew reasonable inferences from the evidence, in particular, four photographs showing the interior of Tavares' vehicle, arguing that the photos showed the mechanical controls of the front seats and "the clearance under the front seats of [Tavares'] vehicle[.]" However, although the four photographs the State points to -- exhibits 9, 13, 14 and 15 -- reflect that there were controls on the side of the seats, none of the photos provide a view underneath the driver's seat to infer that there was insufficient clearance for the handgun to be slid from the back. Indeed, exhibit 9 shows the handgun partially under the front portion of the driver's seat. Moreover, Tavares provided the only testimony about the clearance under the driver's seat,

16

testifying that there was clearance under the seat and that Hampp could have pushed the handgun under the driver's seat.

The State further argues that Tavares acknowledged on cross-examination that "if someone placed the gun under his seat while he was in the car, he would have noticed because it would 'have to have been in between [his] legs' based on where the gun was located[.]" This testimony by Tavares, however, was in response to a question whether, if someone was in the backseat and leaned forward to put something between Tavares' legs, would he have noticed. This testimony did not address whether there was clearance under the driver's seat.

Given the improper statement by the DPA, we consider whether it was harmless beyond a reasonable doubt. The harmless beyond a reasonable doubt standard "requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." Rogen, 91 Hawai'i at 412, 984 P.2d at 1238 (citation and internal quotation marks omitted). Here, defense counsel's objection was overruled and there was no curative instruction. Moreover, the defense theory of the case was that either Hampp or Simer could have placed the handgun under Tavares' seat and there was evidence that Hampp was lying across the back seat when the officers approached. Thus, the question of whether Hampp could have pushed or slid the handgun from the back under the driver's seat was of great importance to this case. The evidence on this point is not strong for either side; thus, we conclude that the improper statement by the DPA was not harmless beyond a reasonable doubt. We further conclude, however, that the misconduct was not so egregious as to bar re-prosecution.

Therefore, Tavares is entitled to a new trial.

17

## IV.  Conclusion

Based on the foregoing, we vacate the Judgment of Conviction And Sentence filed on April 6, 2011 by the Circuit Court of the First Circuit.  We remand for further proceedings consistent with this opinion.

DATED:  Honolulu, Hawaiʻi, June 28, 2013.


On the briefs:

Dwight C.H. Lum
for Defendant-Appellant

Stephen K. Tsushima
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

18